## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

| | | |
|---|---|---|
| **CAROLYN LUBY,  KYLIE ANGELL,** | : | |
| **ERICA DANIELS, ROSEMARY** | : | **CIVIL ACTION NO.:** |
| **RICHI, and SILVANA MOCCIA,** | : | |
| | : | **3:13-cv-1605 (MPS)** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **UNIVERSITY OF CONNECTICUT,** | : | |
| | : | |
| **Defendant.** | : | **December 20, 2013** |

_____ :

### AMENDED COMPLAINT

### I.    NATURE OF ACTION

1.     This is an action for injunctive relief and damages against the Defendants for discrimination on the basis of sex and retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

### II.    PARTIES

2.     Plaintiff Carolyn Luby resides in Storrs, Connecticut.

3.     Plaintiff Kylie Angell resides in Trumbull, Connecticut.

4.     Plaintiff Erica Daniels resides in South Windsor, Connecticut.

5.     Plaintiff Rosemary Richi resides in Somers, Connecticut.

6.     Plaintiff Silvana Moccia resides in Somerville, Massachusetts.

7.     Defendant University of Connecticut ("UConn" or "the university") is a public university located in Storrs, Connecticut.

III.   **JURISDICTION AND VENUE**

8.     This Court has jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

9.     Venue is proper within this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because the Defendant is located in Connecticut and the conduct underlying the Plaintiffs' claims occurred in Connecticut.

IV.   **FACTUAL AVERMENTS  (CAROLYN LUBY)**

   A.   **Ms. Luby Experiences that UConn Is Indifferent to Sexual Violence Against Its Female Students.**

10.    Carolyn Luby started as an undergraduate student at UConn in August 2009.

11.    In Ms. Luby's first year at UConn, she was drugged at a party on UConn's campus and taken, unconscious, to the hospital by ambulance.

12.    When Ms. Luby was discharged from the hospital and returned to her dormitory, she received a call from her Hall Director who informed her that a Resident Assistant had seen alcohol containers in her (shared) room when the EMTs arrived.

13.    Even though Ms. Luby told the Hall Director that she had been drugged and taken to the hospital, and the hospital confirmed that she had been drugged, the Hall Director did not ask her for any details about her ordeal.  She did not inquire about the circumstances under which Ms. Luby had been drugged, whether she knew who had drugged her, or whether she had been sexually assaulted (which she fortunately was not).  Nor did the Hall Director provide Ms. Luby with any services or options in reporting this crime.  Instead, she simply informed Ms.

Luby that, under the circumstances, she would not be investigated by Community Standards for having alcohol in her room.

14.     In Ms. Luby's junior year at UConn, in 2012, she participated in a UConn study abroad program in Granada, Spain.

15.     The study abroad program was run by UConn and charged UConn tuition.

16.     UConn provided no training to any of the students on the trip regarding the risks of sexual harassment and assault or how to avoid them.  UConn did not even provide any training to the Resident Director ("RD") for the trip — the only UConn employee responsible for the students' welfare — regarding how to counsel students in avoiding sexual harassment and assault or how to manage reports of such conduct.

17.     In the beginning of the semester abroad, in February 2012, Ms. Luby was hospitalized with an intestinal disease.  The RD suspected that Ms. Luby's illness had resulted from alcohol consumption, even though the doctor assured her it had not.  At the next meeting of the students, the RD told the students that, if they got into "bad situations" and she discovered that they had been drinking, she would send them home.  This admonition served to discourage Ms. Luby and her fellow students from reporting instances of sexual harassment or assault for fear that they would be sent home.

18.     For example, in March 2012, while Ms. Luby was dropping off a friend at her house, a man came up behind her without her noticing, ran his hands down her rear, felt her inner thigh and under her dress, pulled at her underwear from underneath her dress, and then ran away.  Ms. Luby did not report the incident because she feared the RD would misunderstand and send her home.

19.     For another example, also in March 2012, Ms. Luby arrived at her apartment building in the early morning hours and rode the elevator with a Spanish man.  As the elevator doors were opening, the man attempted to steal her handbag.  While he did so, he lifted up her dress, stroked her thigh, and groped her breast.  Ms. Luby hit him in the face and ran into her apartment while he ran down the stairs.  Again, Ms. Luby did not report this incident for fear she would be sent home.

20.     When other female students on the trip reported experiences of sexual assault and violence to the RD, she did not take any concrete action.  A taxi driver forced one of the other female students to kiss him before he would allow her to leave the vehicle.  Another female student was robbed at knifepoint.  A taxi driver dropped off another student in a dangerous area of the city after she refused his sexual advances.

21.     When Ms. Luby returned to UConn's Connecticut campus, she and other students who had experienced harassment and assault while abroad designed an activism project under the supervision of Professor Manisha Desai.  Their goal was to provide information and orientation regarding sexual violence for students traveling abroad.  With Dr. Desai's assistance, the students presented their research and information to Dorothea Hast in the Study Abroad Office.  The students also submitted their plan to the team involved with the new UConn website sexualviolence.uconn.edu, which was then under development.

22.     When the students met with Ms. Hast, she agreed that UConn needed a program to educate students studying abroad regarding sexual violence.

23.     Although Ms. Hast was a mandatory reporter of sexual violence, and several students shared with her their experiences as survivors of sexual assault or secondary survivors

4

of sexual assault, she never informed those students regarding their reporting options or available resources.

24.     Following the meeting, Ms. Hast failed to respond to emails from the student group.

25.     Ms. Hast promised the group that she would permit them to give a presentation at the orientation for all students studying abroad.  However, when the group arrived, prepared to deliver their presentation, Ms. Hast informed them that the "spot had been filled" and they would not be permitted to speak.

26.     Ms. Hast remained evasive and unresponsive, even as the students tried to present to smaller orientations between resident directors and students.  The students were never permitted to provide orientation materials regarding sexual violence.

     **B.**     **Ms. Luby's Open Letter About Sexual Violence at UConn Results in Violent Threats, Including Threats of Rape, Against Ms. Luby, to which the University Exhibits Indifference.**

27.     On April 24, 2013, after several failed attempts to work with UConn's administration to draw attention to various issues surrounding sexual violence at the university and at university-sponsored programs abroad, Ms. Luby wrote an open letter to UConn President Susan Herbst, which was published on an academic website called *The Feminist Wire.*

28.     The letter concerned the administration's recent enthusiastic rebranding of an "intimidating, aggressive" new Husky mascot.  The letter respectfully criticized the administration for touting such traits while simultaneously refusing to meaningfully respond to well-publicized instances of domestic violence involving athletes.

29.     One day after the open letter was published, on April 25, 2013, Ms. Luby began receiving threats of violence.  A website called *Barstool Sports* had posted the open letter, cited Ms. Luby's full name, posted photographs of her, and dedicated three separate pages to hate speech and threats of violence (including rape) directed towards her.

30.     A fellow student informed Ms. Luby of the threats while she was working at her job in UConn's Financial Aid office.  Ms. Luby left her shift as soon as it was over, for fear of being attacked or threatened at work.

31.     As Ms. Luby was walking out of the Financial Aid office and entering another building on campus, a group of male UConn students approached her and stated:  "Are you that bitch who wrote that letter?  You are pretty enough to rape."

32.     Fearful for her safety, Ms. Luby went quickly to her next class and told the professor, Heather Turcotte, what had happened.  Professor Turcotte advised Ms. Luby to report the incident to the police.  Ms. Luby's entire class joined her to show their support.

33.     When Ms. Luby arrived at the UConn police station, she told the officer at the window about the threats on the website and the threat that had just occurred on UConn's campus.  The officer asked where Ms. Luby lived.  When she told the officer her address, which is less than two miles from UConn's campus, he stated that the UConn police did not have jurisdiction over her and that she should report her complaint to "Troop C."  After Ms. Luby insisted that she was a UConn student who was harassed while on campus, the officer finally relented and agreed to have someone speak to her.

34.     Another officer called out Ms. Luby's name and brought her to the other side of the door of the waiting room.  Instead of bringing Ms. Luby to a private area or even offering her

a chair, he stood there with Ms. Luby and questioned her in front of everyone in the waiting room.

35.     While Ms. Luby told the officer everything that had happened, he wrote virtually nothing on his notepad.  When Ms. Luby finished speaking, he said he was sure that the threats she had described were not direct threats and that such threats happen on the internet all the time. He advised her to give the situation time to die down.  When Ms. Luby asked what she should do in the interim to feel safe, he told her to put up her hair, wear a hat, and not draw attention to herself by what she wore or did.

36.     The threats rapidly escalated.  Ms. Luby received hostile, anonymous emails to her UConn student email account ("@uconn.edu"), as well as to her Facebook and Twitter accounts.  One tweet she received included a video of a wrestler beating up a woman, saying that Ms. Luby would get what was coming to her.  An anonymous post on the *Barstool Sports* website stated: "here's her email: Carolyn.Luby@uconn.edu let's get her."  Several other website commenters identified themselves as UConn students and said they would rape her.

37.     On April 26, 2013, Ms. Luby, along with Professor Turcotte, spoke with UConn's Title IX Coordinator and the Director of UConn's Office of Community Standards.  Ms. Luby described the harassment she had experienced.  The Title IX Coordinator and the Director of Community Standards said very little, other than thanking Ms. Luby for informing them and stating that they would look into the matter.  Ms. Luby asked whether UConn's administration or President knew about the conduct to which she had been subjected, and they responded that they both did.

38.     On April 30, the Title IX Coordinator and the Director of Community Standards informed Ms. Luby via a brief email that they checked *Barstool Sports* and the activity seemed to be slowing.  They also stated that the male student who had tweeted her the video and threat had already graduated, so there was nothing they could do.

39.     Ms. Luby met with Kathleen Holgerson at UConn's Women's Center, who put her in contact with Magdalena Vargas from the University Police Department.

40.     Officer Vargas tried to deter Ms. Luby from reporting to Troop C.  She told Ms. Luby to call the police after each incident of harassment that she experienced on campus, and she advised Ms. Luby to follow her harassers to see where they were going so that she could inform the police of their location.  Fearing for her safety, Ms. Luby declined to follow that advice.

41.     The harassment continued.  Ms. Luby was constantly stalked by students, one of whom followed her through a parking garage as she was walking to her car and stated, "Don't worry I won't rape you."

42.     Ms. Luby's letter and the harassment that followed received national attention.  It was covered by the Huffington Post, Rush Limbaugh, NPR, and the CT Capitol Report, among others.

43.     UConn's administration knew about the sexual harassment and hostile environment Ms. Luby experienced, yet it took no action to address it.  On April 22, two days before Ms. Luby's open letter, UConn's President had disseminated a campus-wide official announcement asking students to throw away their garbage in an effort to beautify the school. UConn made no similar official announcement following Ms. Luby's ordeal, however, refusing

8

to make clear to the UConn community that the threats, stalking, and harassment Ms. Luby experienced in retaliation for speaking out would not be tolerated.

44.     After Ms. Luby was informed by Community Standards on April 30, 2013, that activity on *Barstool Sports* seemed to be slowing, she never heard anything again from Community Standards, the Title IX Coordinator, or the UConn police.

45.     After many days of silence and apparent inaction by the university, *The Feminist Wire* generated a petition to the UConn administration urging them to take action.  Despite garnering 1,200 signatures, the petition went unanswered.

46.     Three professors in UConn's Women's, Gender and Sexuality Studies department published an article imploring the administration to respond.  The administration did not respond.  Upon information and belief, all three professors have been informed that their contracts will not be renewed upon their expiration.

**C.     Instead of Taking Measures to Protect Ms. Luby, the University Retaliates against Her for Speaking Out.**

47.     On May 7, 2013, at a silent protest organized by students to support Ms. Luby, which she attended, the administration retaliated against her.  President Herbst spoke to the protesters, describing Ms. Luby's actions as "inappropriate," "attacking," and "incendiary." President Herbst stated that Ms. Luby should have brought her concerns directly to her, rather than publishing them in an open letter.  During her speech, President Herbst asked the Title IX Coordinator what her position was because she "did not know what her role was."  President Herbst ended her speech by stating that she would make no statement to the university

community about the backlash against Ms. Luby in order to "protect the status of an open investigation."

48.     This was the first time Ms. Luby had heard that her concerns were being investigated.  Ms. Luby was never told that any detective had been assigned to investigate her report, nor was she told if any of her harassers or those threatening to rape or kill her were ever identified and, if so, sanctioned.  Other than the one follow-up made by Community Standards shortly after Ms. Luby  reported to them, no university employee inquired as to whether she had experienced any new threats or incidents of harassment.  To this day, Ms. Luby has not been informed of any findings generated from any investigation.

49.     On April 25, 2013, the UConn newspaper, *The Daily*, had published an article in which Ms. Luby was quoted as saying that "[m]y ex-boyfriend, who I literally have not heard from in years, who used to abuse me and rape me on campus, texted me and said, 'I see you made it big on *Barstool*.'"

50.     This self-disclosure of her status as a survivor of rape on campus was made in a newspaper that many mandated reporters read.  During Ms. Luby's meeting that same week with UConn's Title IX Coordinator and its Director of Community Standards, both of whom are mandated reporters, Ms. Luby mentioned that text message and harassment from her ex-boyfriend.  But no one from either office ever followed-up or wrote a report regarding this disclosure, either to ensure Ms. Luby's well-being or to ensure the accuracy of the University's crime statistics.

51.     Neither the Title IX Coordinator nor the Director of Community Standards informed Ms. Luby about her right to file a complaint with local law enforcement.

52.     Throughout the summer of 2013, Ms. Luby was on campus working at both the UConn Financial Aid Office and the Women's Center.  Ms. Luby continued to be harassed on campus.  On one occasion, as she was walking back to work from a lunch break, a car full of male UConn students threatened to rape her.  They yelled out to her "here, kitty kitty" and "welcome to the dog pound," and they barked and growled at her.

53.     On October 24, while Ms. Luby's car was parked in a commuter lot on UConn's campus, an unknown person let the air of her car's tires.  Ms. Luby has driven the same vehicle throughout her time at UConn, and the bumper stickers on it make her vehicle easily recognizable as hers.

**D.     Ms. Luby Sustains Damages.**

54.     The persistent sexual harassment, stalking, and threats to which Ms. Luby was subjected, along with the administration's failure to protect her from such misconduct, created in Ms. Luby such a fear for her physical safety that she was unable to fully participate in normal college activities, such as attending classes or Student Union–sanctioned events.

55.     Ms. Luby was unable to attend almost all of her courses during the last two weeks of classes in the spring of 2013, and she had to seek extensions on several projects and final examinations, as she could not even utilize libraries without being recognized and threatened by other students.  Ms. Luby was so terrified that she did not want to leave her house.

56.     Since these threats also occurred as Ms. Luby was going to and leaving work, she also could not work at her on-campus job, on which she depended financially.  Although she informed her manager at her job of the reason why she could not work, at no time did he or

anyone else from UConn offer her any assistance, such as an escort to ensure her safe travel to and from work and school.

57.    The impact of the harassment on Ms. Luby's life has been all-encompassing.  She has trouble sleeping; she has experienced weight loss; she is unable to participate in social groups where she does not know everyone present; and she is terrified when she is on UConn's campus.

## V.    FACTUAL AVERMENTS  (Kylie Angell)

### A.    Ms. Angell Is Raped by a Fellow UConn Student, and the University Fails to Advise Her of the Resources and Options Available to Her.

58.    On July 5, 2010, while working as a UConn Residential Life Summer Conference Housing Supervisor, UConn student Kylie Angell was raped by a classmate.  The rape occurred in her on-campus dormitory provided to her by her summer job at UConn.

59.    Two days following the rape, Ms. Angell sought advice from the Health Education Coordinator at UConn's Health Education center.  She informed this UConn staff member of the incident.  The Coordinator asked her if she "felt like it was all a bad dream," and Ms. Angell responded, "Yes, that's exactly how it feels."

60.    The Coordinator's sole advice to Ms. Angell was to go to Planned Parenthood in Willimantic for a physical examination and to obtain Plan B emergency contraceptive from the UConn Infirmary pharmacy.

61.    The Coordinator did not give Ms. Angell any information concerning reporting her rape to the police or to UConn's Office of Community Standards, nor did she advise Ms. Angell about contacting a rape crisis center or UConn's Community Response Team.  The

Coordinator also did not tell Ms. Angell that she (the Coordinator) was a mandated reporter or that she was going to report the incident to the police.

62.     Overwhelmed and unsure of what to do, Ms. Angell discussed the situation with friends and decided to have the physical examination and take the Plan B pill.  She did not consider calling the police or telling family because she was embarrassed, ashamed, and nervous, and because the Health Education Coordinator never presented these options to her.

63.     At the start of the academic year, in September 2010, Ms. Angell approached Venida Rodman Jenkins, Associate Director of the UConn Women's Center, and explained to her what she had told the Health Education Coordinator that summer.  Ms. Rodman Jenkins listened to Ms. Angell's story and asked her if she had reported the rape.  Ms. Angell said she had not, because she felt ashamed and, more importantly, because she had not received affirmation from the Health Education Coordinator that she could report this to the police.  Ms. Rodman Jenkins told Ms. Angell that she could report the rape to Community Standards.

64.     Approximately one week later, in the middle of September 2010, Ms. Angell spoke to the Assistant Director of UConn's Office of Community Standards, Cinnamon Adams. Ms. Adams informed Ms. Angell that reporting through Community Standards was the usual response by victims, and that going to the police was a last resort in case the hearing did not bring about the results that Ms. Angell felt were necessary (such as the rapist being expelled from campus).  Because Ms. Angell did not want to disrupt her schoolwork anymore than the rape already had, she heeded the advice of Community Standards and did not report the rape to the police.

**B.     The Hearing Conducted by the University Results in Multiple Findings Against Ms. Angell's Rapist.**

65.     In October 2010, UConn, through the Office of Community Standards, conducted a hearing concerning Ms. Angell's rape allegations.  The hearing resulted in a finding that the perpetrator was guilty of at least four charges, including: possession of drugs, providing alcohol to a minor (that is, Ms. Angell), breaking and entering, and sexual misconduct.

66.     UConn informed Ms. Angell that, as a result of the findings at the hearing, the perpetrator been expelled from the university and was forbidden to enter the UConn campus. UConn also informed Ms. Angell that it had issued a permanent no-contact order, which prohibited the perpetrator and his friends from contacting Ms. Angell directly or indirectly.

67.     Ms. Angell was then given the option of reading an Impact Statement in front of the perpetrator.  Relying upon representations that she would no longer have to see him again on campus, she read him a heartfelt account of her post-rape feelings and experiences.

**C.     UConn Allows Ms. Angell's Rapist Back on Campus Without Notifying Her, and the University, along with the UConn Police, Respond to Her Resulting Trauma With Indifference.**

68.     Two weeks after the expulsion of the perpetrator, on November 1, 2010, Ms. Angell was sitting in UConn's Northwest Dining Hall, which has a capacity of at least 400 people.  The dining hall was not nearly full to capacity at that time, so there were many empty seats around Ms. Angell and in other areas of the dining area.

69.     Ms. Angell was talking to her friend across the table when she sensed someone sit down next to her chair and graze his arm against hers.  When she turned to see who it was, Ms.

Angell found herself within inches of the student who had raped her and who, she believed, had been permanently expelled from campus and forbidden to contact her.

70.    Ms. Angell was shocked and paralyzed by fear.  A former mutual friend ran up to Ms. Angell's assailant and shouted, "Your expulsion was appealed!  You're back!  You're back!"

71.    At no time had UConn informed Ms. Angell that the perpetrator had filed an appeal, let alone that it had reversed its expulsion decision and allowed him to return to UConn's campus.

72.    Ms. Angell quickly got up and ran behind a wall in the food service area, beginning to tremble and cry.  The perpetrator's friend then approached Ms. Angell and confronted her, saying in a mocking and vicious tone, "Kylie, how does it feel that he's back on campus?"  Ms. Angell was beside herself.  Her friend helped guide her out of the dining hall, where Ms. Angell found shelter in a bathroom and nearly fainted to the floor.

73.    Ms. Angell was advised by her off-campus therapist, Jamie Krall, MSW, LCSW, to report the stalking and harassment to the UConn campus police immediately.  Ms. Angell did so, bringing two friends with her.  She sat in the waiting room for at least half an hour, trembling and fearful for her life, afraid that any moment the perpetrator or his friend would come through the door of the station.

74.    While waiting at the police station, the former mutual friend that had harassed Ms. Angell in the dining hall texted one of the friends that was with Ms. Angell at the police station, asking if Ms. Angell was going to report to the police.  This broke the no-contact rule for the second time in one night.

75.     When Ms. Angell was finally allowed to speak to a police officer, she explained what had happened.  The officer brought her into a questioning room with a female police officer, Linda Lougee, to speak about her experience in more detail.  Ms. Angell recounted to Office Lougee her entire ordeal, from the rape in July 2010 to the UConn Community Standards hearing to the perpetrator's stalking of her that night in the dining hall.

76.     During the interview, Officer Lougee reprimanded Ms. Angell for not reporting the crime as soon as it had happened.  She then told Ms. Angell that, "Women have to just stop spreading their legs like peanut butter," or else rape is going to "keep on happening 'til the cows come home."  Ms. Angell was devastated by Officer Lougee's statement.

77.     Officer Lougee told Ms. Angell that she herself had been through things like this in her life, and she just learned she had to get over it and be stronger.

78.     Officer Lougee told Ms. Angell that she did not have enough presentable evidence to file a formal report and that, even if she did, it was emotionally and psychologically exhausting for a survivor to formally report rape.

79.     Unable to conceptualize another moment of feeling traumatized, Ms. Angell heeded Officer Lougee's advice and did not submit a report to the police.

80.     The next day, the Associate Director of the Women's Center, Ms. Rodman Jenkins, scheduled a meeting with herself; Ms. Angell; UConn's Vice President of Student Affairs, John Saddlemire; and UConn's Director of Community Standards, Catherine Cocks.

81.     During that meeting, Ms. Angell learned for the first time that Mr. Saddlemire had accepted the appeal from the perpetrator and his attorney because he felt that expulsion was too severe a penalty.

82.     At one point in the meeting, Ms. Angell referred to what happened to her as "rape" and "sexual assault." Mr. Saddlemire disregarded the substance of what Ms. Angell had said and instead challenged her rhetoric, saying, "We do not call it those terms at UConn, Ms. Angell. We call it 'sexual misconduct.'"

83.     Ms. Angell requested that the documentation from the university's appeals process be sent to her so she could understand why the sanctions were reversed, even though the findings that the perpetrator was guilty of all charges against him were not.

84.     During a meeting with employees from the Office of Community Standards and the Division of Student Affairs, Ms. Angell was told that the staff member from Community Standards who was responsible for informing Ms. Angell that her rapist was permitted back on campus had simply forgotten to call her. It is unclear whether this individual was also tasked with advising Ms. Angell regarding what protections would be available to her now that the perpetrator was back on campus, but, in any event, no such guidance was given.

**D.      The University's No-Contact Order Provides No Meaningful Protection to Ms. Angell, and the University Fails to Revisit the Propriety of Continuing to Allow Her Perpetrator to Remain on Campus, Despite His Multiple Violations of the Order.**

85.     The Associate Director of the Women's Center, Ms. Rodman Jenkins, spoke with the leadership of Community Standards on Ms. Angell's behalf. She learned that the no-contact order was still in place when Ms. Angell's assailant harassed her in the dining hall, less than an hour after he was allowed to return to campus.

86.     The Director of Community Standards informed Ms. Angell that the Office had looked at her class schedule for the rest of the semester, and it did not match up with any of the

same classes or buildings as her rapist, so UConn believed the chances of her running into him again were low.

87.     Ms. Angell was informed that the perpetrator was not allowed in any dormitories or in any but one of the dining halls.

88.     Ms. Angell was then informed that the perpetrator was allowed everywhere else on campus, including the places Ms. Angell most frequently visited: the gym, the library, and the Student Union.  Community Standards and Student Affairs simply mandated that the perpetrator would have to leave a building if he saw Ms. Angell there.

89.     Despite this rule, Ms. Angell frequently passed her rapist on her way to class and at the gym, library, Student Union, or social gatherings.

90.     UConn made no modification to the liberties it afforded Ms. Angell's assailant, notwithstanding his blatant violation of its no-contact order less than one hour after it permitted him to return to campus or his indirect re-violation of it through his friend who texted one of Ms. Angell's friends shortly thereafter.  Indeed, upon information and belief, UConn performed no investigation into these two incidents.  It never followed-up with Ms. Angell regarding the perpetrator's repeated violations of the university's no-contact order.

91.     Later that week, Ms. Angell was called into the Community Standards office to meet with the officers who conducted the initial disciplinary hearing.  They apologized for not informing her that the Vice President of Student Affairs had allowed the perpetrator back on campus.  Ms. Angell was visibly upset and crying.  She told the officers that she felt she needed to wear a hood and cap when walking on campus because she feared that the perpetrator and his

friends would disobey the no-contact order again and jump her.  No further assistance was offered to Ms. Angell at that time.

92.     On or about November 4, 2010, Ms. Angell requested assistance from the Office of Student Service & Advocacy.  As a result of UConn's decision to permit the perpetrator back on campus with no warning and his immediate violation of the no-contact order, Ms. Angell could no longer go to work.  Not only was she devastated emotionally, but she feared that the perpetrator might harass her as she walked to and from work.

93.     When Ms. Angell informed her advocate from the Office of Student Service & Advocacy, Ashley Hudd-Trotter, that she was too traumatized to work, Ms. Trotter responded that, if Ms. Angell did not return to work, her supervisor would be "understandably" upset.

**E.      Ms. Angell Sustains Damages.**

94.     In the semester following her rape, Ms. Angell's anxiety prevented her from attending many classes, and she missed several examinations.  As a result of the trauma she experienced, she had tremendous difficulty focusing on her education, and her grade point average dropped from 3.6 (in spring 2010) to 2.8 (in fall 2010).

95.     Ms. Angell also dropped all her extracurricular activities for the entire 2010-11 academic year.  She found herself barely able to attend tutoring meetings; she did not have the energy to seek help from her professors; and she quit her position on the UConn varsity crew team.  Because her rapist was a student-athlete, she did attend any more athlete get-togethers, and she avoided sporting events where he might be, as he frequented those venues.

96.     As a result of her rape and the indifferent manner in which UConn responded to it, Ms. Angell was also forced to seek out psychological counseling for the first time in her life. Her therapy continues to this day.

VI.     **FACTUAL AVERMENTS  (Erica Daniels)**

    A.     **Ms. Daniels Is Raped by a Fellow UConn Student and Co-Worker.**

97.     Erica Daniels met the perpetrator in her junior year as a UConn student, when they were both employed as student workers at UConn's South Dining Hall.

98.     By the spring 2013 semester, they had become good friends and socialized often.

99.     On or about March 8, 2013, at a birthday party thrown for Ms. Daniels by a mutual friend, the perpetrator tried to kiss Ms. Daniels.  She walked away quickly and thereafter told him that she was not interested in him as more than a friend.  The perpetrator appeared to accept those parameters to their relationship.

100.     On April 15, 2013, Ms. Daniels and the perpetrator were working together at UConn's South Dining Hall.  Ms. Daniels became upset during the shift when a co-worker spoke about her in a degrading fashion.

101.     Later in the shift, the perpetrator, knowing that Ms. Daniels was upset, invited her to go to his Willimantic apartment after work to talk.  Ms. Daniels appreciated a friend offering support, and given that he had previously assured her that he would honor her wishes for their relationship to remain platonic, she agreed to join him.

102.     After work, as the perpetrator and Ms. Daniels were walking toward the public bus stop, the perpetrator informed Ms. Daniels that he had heard from another individual that she was romantically interested in him.  Ms. Daniels reiterated to him that she was only interested in

him as a friend.  Feeling uncomfortable, she then told him that she would prefer to remain on campus, rather than going to his apartment.  The perpetrator assured her once again that he accepted they would remain platonic friends and convinced her to join him at his apartment.  Ms. Daniels finally agreed to go to the perpetrator's house but only on the condition that he would give her a ride home that night.

103.    When they arrived at the perpetrator's apartment, Ms. Daniels asked if she could borrow a clean shirt from the perpetrator, as she was still in her filthy work clothes.  He provided her with one, and she went to the bathroom to change into it.

104.    When Ms. Daniels emerged from the bathroom, the perpetrator suggested that the two of them play "War" as a drinking game.  He handed her a less-than-three-quarters-full plastic cup of rum and coke, and they proceeded to play the drinking game while sitting on the floor.

105.    As they played the game, and despite the fact that Ms. Daniels had consumed only one drink, Ms. Daniels' head felt very heavy, a sensation she had not experienced before when she drank.

106.    The perpetrator tried to kiss Ms. Daniels, and Ms. Daniels told him she wanted to go home.  The perpetrator responded that he did not like to drive when it was dark and that they could take the bus home in the morning together.

107.    While Ms. Daniels wanted to go home, she feared taking the bus home alone at night.  She attempted to find an alternate ride but was unsuccessful.

108.    After Ms. Daniels complained to the perpetrator that her head felt heavy, he told her she should lie down, and she did so.  Thereafter, he turned off the lights and lay down next to

Ms. Daniels, who, at that point, felt extremely disoriented with a powerful headache.   The perpetrator proceeded to try to kiss her, and she repeatedly turned her head away in attempt to avoid his lips on hers.

109.     The perpetrator put his hands down Ms. Daniels' pants, and she pushed his hand away and told him: "Not happening."   He then tried to force her shirt off, and Ms. Daniels pushed her weight on the bed to thwart the attempt.   She repeatedly told him she wanted to go back to her dorm.

110.     The perpetrator forcibly removed Ms. Daniels shirt and pants and raped her as Ms. Daniels laid there, immobilized by the impact of what she had drunk.   She eventually passed out.

111.     When Ms. Daniels awoke, she began experiencing panic attacks and woke the perpetrator to tell him she was feeling extremely sick and could not sleep.   She again asked him if he could bring her home.   Instead, he raped Ms. Daniels again.

112.     The perpetrator told Ms. Daniels that she would have to wait until 6 a.m. to take the public bus from Willimantic to campus.   In the morning, when Ms. Daniels was still feeling sick, she told him she could not take the bus because of her extreme nausea.   He agreed to bring her back to her dorm, as long as he could sleep there until his class.   Ms. Daniels, desperate to go back to her dorm, agreed to his terms.

113.     Later that day, when Ms. Daniels finally emerged from her bed, she observed she had multiple bruises all over her breasts and upper arms.   In addition to experiencing an intense migraine, she also had jaw pain that continued for approximately one week.

114.    Ms. Daniels called her best friend and described what had happened to her.  Her friend texted the perpetrator on Ms. Daniels' behalf and stated how upset Ms. Daniels was about his actions.  The perpetrator "apologized" and stated it would never happen again.

**B.     Ms. Daniels Reaches Out to UConn for Help, and the University Responds With Indifference.**

115.    Ms. Daniels was constrained to continue to work at South Dining Hall with the perpetrator.  After working a few shifts with him, the emotional distress she experienced as a result of working in such close proximity with her rapist was too great.  She informed her student supervisor, who was also a friend, that she wanted to give up all of her next semester shifts and that she would not be returning.  When the supervisor asked her for the reason, Ms. Daniels told her that the perpetrator had raped her.

116.    Thereafter, Ms. Daniels was told by multiple people that the perpetrator was describing the events of April 15th to others, including her co-workers, as a "drunk hook-up" and that Ms. Daniels was overreacting.

117.    The student supervisor, Jess Malboeuf, spoke to non-student management on Ms. Daniels' behalf and explained that a co-worker had raped Ms. Daniels.  Non-student management informed her that they could do nothing and that Ms. Daniels' only option was to report the perpetrator's conduct to Community Standards.

118.    At the end of April, Ms. Daniels sent an e-mail to a student manager.  In that e-mail, she explained that she had been raped by the perpetrator, her co-worker, and that she was quitting her job.

119.    Her friend, who was a student supervisor, finally contacted Ms. Daniels and offered to transfer her to another dining hall.  Ms. Daniels accepted the transfer.

120.    South Dining Hall never investigated Ms. Daniels' allegations.  Instead, they promoted the perpetrator to student manager.  He still works there.

121.    On or about June 28, 2013, Ms. Daniels reported the April 15 rape to Community Standards.  She stated that she believed, after speaking with her therapist and describing her symptoms that evening, that the perpetrator had drugged her.

122.    Early in the summer of 2013, Ms. Daniels filed a formal complaint with Community Standards.  Two weeks before the fall semester began, Community Standards informed Ms. Daniels that it did not have enough information to pursue the matter any further and that it could make no definitive findings.  Community Standards never shared with Ms. Daniels what additional information it needed to conclude its investigation.

123.    Community Standards reached this conclusion notwithstanding the fact that Ms. Daniels' sister had informed it that she had confronted the perpetrator and that he had apologized, stating that he felt badly about what he had done to Ms. Daniels.  He then became defensive and said: "Well, she never said no."  Ms. Daniels' sister responded:  "She was passed out.  How could she say no?"  Community Standards asked Ms. Daniels' sister if she knew the perpetrator's exact words and whether he had directly admitted the sexual assault.  She stated that, while he did not directly admit that he had sexually assaulted Ms. Daniels and she could not remember verbatim what he said, he did state that he had "messed up" with respect to his conduct toward Ms. Daniels and admitted that what he had done should not have happened.

Community Standards stated that it could not use her sister's information about the perpetrator's statement, as it did not deem the statement to be a confession.

124.     Community Standards refused to interview the person Ms. Daniels was dating at the time of the rape, who had relevant information supporting her claims.

**C.     The University's No-Contact Order Provides No Meaningful Protection to Ms. Daniels.  In Fact, the University Threatens to Find Ms. Daniels in Violation of It.**

125.     The only action Community Standards took was to issue a no-contact order, which was limited to prohibiting Ms. Daniels and the perpetrator from communicating with one another.  The order did not prevent the perpetrator from being in Ms. Daniels' presence: he could show up at her work, her classes, and outside her dorm building without violating the order.

126.     Ironically, Community Standards threatened to find Ms. Daniels in violation of the no-contact order because, when the perpetrator appeared in close proximity to her and began staring at her, she made a non-verbal gesture toward him, "flipping" him off.

**D.     Neither the UConn Police nor the University Take Any Action to Address Ms. Daniels' Concerns.  Instead, the University Subjects Ms. Daniels to Additional Trauma.**

127.     Ms. Daniels reported the rape to the UConn police.  Officer Eric Bard informed her that the crime was out of their jurisdiction.  He assured her, however, that UConn police would look into how Dining Services and Community Standards handled her case. When a lengthy period of time passed without Officer Bard getting back in touch with her, Ms. Daniels contacted him and inquired about the status of his investigation into the conduct of Dining Services and Community Standards.  Officer Bard denied he had ever agreed to investigate that conduct, and indeed, upon information and belief, he had not investigated it.

128.    Ms. Daniels reported the event to the Willimantic police as well.  They informed her that they needed to obtain a search warrant in order to acquire information from Community Standards.  To date, they are continuing to try to get the search warrant.

129.    When Ms. Daniels described her symptoms to the Willimantic police following the consumption of that single rum and coke, they informed her that her symptoms were consistent with withdrawal from a drug.

130.    To date, UConn has done nothing to address Ms. Daniels' allegation that she was raped by a fellow UConn student and co-worker, other than to issue the no-contact order.

131.    Instead, on October 24, 2013, as Ms. Daniels was sitting in the front row of her criminology class, the professor showed the class, which consisted of approximately 200 students, a slide with general information regarding the Title IX complaint that she and several fellow students had filed on October 21, 2013.  The next slide he showed was a photograph of all the students who had filed the complaint, including Ms. Daniels.

132.    Ms. Daniels was so traumatized by the slides that she grabbed her belongings and left the classroom.  The professor later apologized via email for the "discomfort" she experienced.

133.    Also in the fall 2013 semester, Ms. Daniels regularly saw her rapist on campus, as often as three times per week, apparently due to their conflicting schedules.  When she alerted Community Standards regarding the scheduling issue, it advised her that it could assist her in changing her schedule.  She had not previously been advised of that option.

**E.     Ms. Daniels Sustains Damages.**

134.    In the semester following her rape, Ms. Daniels has experienced significant difficulty concentrating in her classes, and her attendance has suffered.  She is constantly afraid that she will encounter her rapist.

135.    Ms. Daniels eventually dropped the course that led her to see her rapist regularly on campus.  As a result, she will be forced to take a winter intersession course, which is significantly more expensive than a fall or spring course.

136.    Following the rape, Ms. Daniels felt emotionally unable to work at the dining hall, and she frequently called out sick.

137.    Ms. Daniels had been seeing a psychotherapist prior to being raped.  However, following the rape, the therapist prescribed additional medication in order to manage the emotional distress Ms. Daniels experienced as a result of the rape and the manner in which it was handled by the university.

**VII.    FACTUAL AVERMENTS  (Rosemary Richi)**

**A.     Ms. Richi Is Raped in a UConn Dormitory.**

138.    Rosemary Richi started as an undergraduate student at UConn in the fall of 2011.

139.    In September 2011, Ms. Richi was raped by a male student who lived in her dormitory on the UConn campus.

140.    The perpetrator was a member of the UConn football team.

141.    The night of the rape, the perpetrator asked Ms. Richi if she wanted to join him while he did his laundry.  Ms. Richi agreed, and the two walked around the dormitory for a little while.

142.    Eventually, the perpetrator asked Ms. Richi if she wanted to go to his room to talk.

143.    Knowing that the perpetrator's roommate was also in his room, Ms. Richi agreed.

144.    When the two arrived at the perpetrator's room, Ms. Richi observed that his roommate was asleep on his bed.

145.    The perpetrator asked Ms. Richi to take some shots of alcohol with him, joking that he could outdrink her.  Ms. Richi drank three shots of alcohol in total.

146.    The perpetrator invited Ms. Richi to sit on his bed.  She did.

147.    The perpetrator tried to tickle Ms. Richi, but she told him truthfully that she was not ticklish, and she asked him to stop.

148.    At that point, Ms. Richi got up to leave, telling the perpetrator that she was tired.

149.    The perpetrator then pushed Ms. Richi down onto his bed, repeatedly saying that she should have been ticklish.

150.    The perpetrator put his hands down Ms. Richi's pants.

151.    Ms. Richi repeatedly told him to stop, but he overpowered her.

152.    Ms. Richi repeatedly said "No" to the perpetrator, but he raped her.

153.    Before she left his room, the perpetrator told Ms. Richi not to tell anyone what had happened.  He later reiterated that admonition in a text to Ms. Richi.

154.    Ms. Richi spent the next week in her bed, crying.  She did not know where to go for support, and she thought that, because her rapist was a football player, no one would believe her.  Ms. Richi did write about the rape on her blog.

**B.**     **Ms. Richi Reaches Out for Help, and the University and UConn Police Both Respond With Indifference.**

155.     Over time, Ms. Richi felt she could no longer remain silent about her rape.

156.     In February 2012, she texted the perpetrator.  She told him that, if she ever heard of him sexually assaulting another student, she would tell the police.  The perpetrator did not respond.

157.     In the fall of 2012, Ms. Richi joined a class in the Violence Against Women Prevention Program (VAWPP).

158.     In the spring of 2013, Ms. Richi talked about her rape to the Men's Project, a subgroup of VAWPP in which men are trained as peer educators to present to all-male groups on issues of violence against women.

159.     Her teacher, Kathleen Holgerson, who was the Director of the UConn Women's Center, was attending the meeting.

160.     Ms. Holgerson told Ms. Richi that she was obligated to report Ms. Richi's account to the authorities.

161.     Ms. Holgerson provided resources to Ms. Richi, told her about reporting options, and wrote down the name of Ms. Richi's rapist.  She reported the assault to UConn's Office of Diversity and Equity.  However, Ms. Holgerson never actually reported Ms. Richi's account to the police.

162.     The Office of Diversity and Equity never contacted Ms. Richi about the report made on her behalf by Ms. Holgerson.

163.    A few months later, Ms. Richi decided to report her rape directly to the University police.

164.    She made a statement to Detective James Deveny, and he initiated an investigation.

165.    Ms. Richi provided Detective Deveny with a list of names of people who knew about the rape, and she gave him access to her blog, which included her contemporaneous account of the assault.

166.    Detective Deveny told Ms. Richi that he did not believe her account of the assault and that all he was doing was taking down the information she provided to him.  The report the detective generated following his interview of Ms. Richi had the wrong date of the assault and was riddled with grammatical and spelling errors.

167.    The University police rarely updated Ms. Richi regarding its investigation.

168.    A few weeks after Ms. Richi reported her assault to the UConn police, she received a text from a friend from high school, with whom she had not spoken in more than a year.  This woman informed Ms. Richi that a detective had called her and told her about Ms. Richi's assault.

169.    Ms. Richi was shocked.  She felt violated.  She did not know what this woman had to do with the investigation, and she felt that the police, at a minimum, should have told her that they were contacting people from her town.

170.    A few weeks later, Ms. Richi received a call from University police.  They told her that there was insufficient evidence to pursue her case and that the case would be dropped.

171.   The police did not provide Ms. Richi with any options.  They did not tell her that she could report her assault to the Office of Community Standards in the University's Division of Student Affairs, nor did they make her feel safe.

172.   Ms. Richi subsequently discovered that the University police's investigation had been shoddy.  The police never interviewed her boyfriend, who was the first person she told about the assault; they never interviewed her best friend, who also knew about the assault; and they did not interview anyone from the Women's Center, who had heard Ms. Richi's account.

173.   Ms. Richi's rapist did not receive any punishment.

174.   Later, when Ms. Richi's rapist contacted her in an intimidating fashion, she called the University police.  She left a voicemail, saying that she was afraid and seeking help.  The police never returned Ms. Richi's call.

**C.     Ms. Richi Sustains Damages.**

175.   Following the rape, Ms. Richi often could not leave her bed and, as a result, missed numerous classes.  She had great difficulty focusing in the classes she did attend, and her grades suffered accordingly.

176.   Ms. Richi no longer cared about her future.  Overwhelmed by feelings of shame and guilt associated with her rape, she contemplated suicide on multiple occasions.

177.   Despite entering into a romantic relationship with a new boyfriend, Ms. Richi had difficulty connecting intimately with him.

178.   She cried in fear of the dark every time she had to walk back from her night class. She now associates darkness with the fear and helplessness she felt the night she was raped.

179.    After her first semester, Ms. Richi gained some emotional strength, and that, coupled with a lighter workload, allowed her to improve her grades the following semester.  Her partial emotional recovery was compromised, however, by the lack of support she received from UConn's administration after she reached out for help.

180.    Ms. Richi consulted a doctor, who diagnosed her with Post Traumatic Stress Disorder and suggested therapy.  Ms. Richi has been reluctant to go to therapy, fearful that if her therapist lets her down, as the university administration did, her recovery would be further hindered.

181.    Ms. Richi continues to feel unsafe on UConn's campus, not only because she is forced to cross paths with her rapist, but also because she does not feel protected by UConn's police or administration.

## VIII.  <u>FACTUAL AVERMENTS  (Silvana Moccia)</u>

### A.    **Ms. Moccia Is Raped by a Fellow Student-Athlete.**

182.    Ms. Moccia was recruited by UConn to play hockey for the university.

183.    On August 26, 2011, she moved into a UConn dorm to begin her freshman year.

184.    On August 28, 2011, Ms. Moccia attended a women's hockey team party located on campus.  At that party she was provided with alcohol and consumed less than two shots of it.

185.    Thereafter, Ms. Moccia left with three other female students who were also hockey players to attend another party.

186.    As she was being driven to the house where the party was located, her mouth became numb and her face and body tingled.  By the time they arrived at the second location a

short distance away, Ms. Moccia could no longer walk and the three women who accompanied her carried her inside the house.

187.    While inside the house, she spoke with a male student who was also a hockey player (the "male hockey player").   Shortly thereafter, Ms. Moccia became violently ill and repeatedly threw up in the bathroom.   While she was throwing up, the male hockey player walked in and directed the women who had accompanied her into the bathroom to: "Give her some gum so her breath doesn't smell."

188.    As Ms. Moccia was laying on the bathroom floor, the male hockey player told the women to put her in his bed.  Ms. Moccia lost consciousness.

189.    When Ms. Moccia regained consciousness, the male hockey player raped her.

**B.    Ms. Moccia Reaches Out for Help, and the University Responds With Indifference.**

190.    On September 8, 2011, Ms. Moccia found the courage to call the UConn Women's Center to report the rape.  She told Kathy Fischer, the Associate Director of the Women's Center, that a male hockey player had raped her and that she had concerns about telling her coach about the rape.

191.    Ms. Fischer gave Ms. Moccia some pamphlets about rape and referred her to a rape crisis center for counseling.  She offered to call Ms. Moccia's coach for her and advise her that Ms. Moccia had been raped in order to facilitate Ms. Moccia's conversation with her coach.  Ms. Moccia accepted that offer.

192.    Ms. Fischer also advised Ms. Moccia to go to the infirmary to be tested for all sexually transmitted diseases, and Ms. Moccia did so on September 9, 2011.

33

193.    Ms. Fischer did not advise Ms. Moccia of her options to report the rape to Community Standards or the police.

194.    Also on September 8, 2011, Ms. Moccia met with her team doctor, Dr. Thomas Trojian, with whom she had previously met to discuss an injury to her knee.  When she told him she had been raped, he initially asked her who had raped her.   Before she could respond, however, he told her that he did not want to know, although he could probably guess who it was. Instead, he asked her whether she had thought about transferring and even suggested a university to which she could transfer.

195.    Ms. Moccia expressed concern about sharing the information about the rape with her coach.  Dr. Trojian told her she should not be concerned about speaking to her coach because her coach had experience with others on her team being sexually assaulted.

196.    Upon information and belief, Dr. Trojian's notes for that day do not mention the fact that she had been raped and only discussed the injury to her knee, even though there had been no discussion about her knee during her visit, only about the rape.

197.    On September 12, 2011, Ms. Moccia met with her coach, Heather Linstad.  Ms. Linstad began the conversation by berating Ms. Moccia for not having told her about a knee injury Ms. Moccia had sustained earlier that year, informing her that, had she done so, she would have found another athlete.

198.    When Ms. Moccia inquired as to why Ms. Linstad was talking to her about her knee when their conversation was supposed to be about the fact that she had been raped, Ms. Linstad responded by informing Ms. Moccia that, in light of the rape, she did not think Ms.

Moccia was "stable enough" to be on the team.  She also informed Ms. Moccia that she would "bring down the team."

199.    Ms. Moccia told Ms. Linstad that playing hockey was her passion and that it was very important to her to continue playing it.  She then told Ms. Linstad that the UConn student who raped her is a hockey player and that he was on the ice practicing as they were speaking. Nonetheless, Ms. Linstad did not ask for the identity of the rapist.

200.    Instead, she told Ms. Moccia to return her athletic bag that UConn had given her and informed her that she was no longer on the team.  When Ms. Moccia stated that Dr. Trojian had told her that Ms. Linstad had previously had athletes on her team who were raped, Ms. Linstad responded that she had not and that she did not know how to handle such situations.

201.    On September 13, 2011, at her parents' initiation, Ms. Moccia and her parents met with Cathy Cocks, UConn's Director of Community Standards.  Another UConn employee was also present.  At that meeting, Ms. Moccia informed the UConn employees that she had been raped by a member of the hockey team.  They did not ask for the identity of her rapist.  Ms. Moccia also informed them that she had been removed from the hockey team.

202.    Neither Ms. Cocks nor the other employee offered to investigate whether it was appropriate for her coach to remove her from the team.  They did not tell her she had the option to remain in school or offer to provide her with the support and resources she would need in order to do so.  They did not tell her she had the option to contact the police.  They did not tell her that she could pursue an internal claim against her rapist that could lead to a hearing.

203.    The other UConn employee present at the meeting promised to look into Ms. Moccia's concerns about the manner in which Dr. Trojian and her coach handled her report that

she had been raped.  The UConn employee later contacted Ms. Moccia and informed her that both Dr. Trojian and Ms. Lindstad disputed Ms. Moccia's recitation of how they treated her.  She did not offer to investigate further.

204.    Notwithstanding the university's policy that it does not refund tuition after the student has been in school for three weeks, the university fully reimbursed Ms. Moccia her tuition.

205.    After Ms. Moccia left the university, UConn's Assistant Athletic Director sent her a check to reimburse her for her medical expenses associated with being raped, and Ms. Cocks wrote a letter for Ms. Moccia to provide to colleges, stating that she had been the victim of an "incident" in 2011 and left the university in good standing.

### C.    Ms. Moccia Sustains Damages.

206.    Ms. Moccia returned home and started seeing a therapist to cope with the rape and the manner in which UConn handled her reporting of it.  She continues to see a therapist to this day.

207.    Ms. Moccia matriculated to another university in January 2012.

208.    While she attempted to live on campus, the emotional distress she continued to experience as a result of the rape and the manner in which she was treated by UConn after she reported it was too great, and she returned to living at home and commuting at school.

209.    As a result of UConn's failure to abide by Title IX, including failing to inform her of all of her options following her report of the rape, retaliating against her for that report by throwing her off the hockey team, and encouraging her to leave UConn, rather than address the rape and offer her resources and support to cope with it, Ms. Moccia has suffered and continues

to suffer severe emotional distress.  That emotional distress has negatively impacted every aspect of her life including, but not limited to, her academic performance and her inability to resume playing hockey, the sport that she loved.

## IX.   FACTUAL AVERMENTS (Plaintiffs Luby, Angell, Daniels, and Richi)

### A.   UConn's Television Station Airs a Video Promoting Sexual Violence, and UConn's Administration Responds with Indifference.

210.   On November 10, 2011, UConn's student run television station, UCTV, ran an episode of "Shenanigans" featuring a video entitled "Evil Blue Light."

211.   The video takes place on a path that UConn students generally call "Rape Trail." A woman is running away from a man in a trench coat and mask.  She runs up to one of UConn's emergency blue lights and presses the button for help.  However, instead of help, a personified talking Blue Light answers her and refuses to contact the police.  The Blue Light tells her: "I'll fuck you so hard you will wish you were raped by someone else."  It also says: "You dumb blonde bitches don't ever understand, always crying about being raped.  Suck it up."  The video ends with the victim being strangled by the rapist, which turns on two of the other blue lights.

212.   UCTV aired the episode again on January 31, 2012.  On this occasion, students organized an open forum to discuss the video.  The next day, a rally was held denouncing the video, sexual violence, and rape culture.

213.   UCTV took the episode off of its website and issued an apology.  In contrast, the UConn administration took no steps to address the rape culture and sexual violence prominent on UConn campus that this video promoted.

214.    A student group called Students Against Rape Culture issued a petition, signed by 566 students, calling upon the UConn administration and UConn President Susan Herbst to: (1) issue a statement addressing UConn's rape culture and condemning the content of the video; (2) provide mandatory sensitivity training for all UConn freshmen which addressed violence against women as well as hate speech, racism, and homophobia; and (3) improve UCTV's policies to prevent something like this from happening again.

215.    UConn's only response was to state that the video had been removed.  The university did not make any statement denouncing what the video promoted, nor did it provide a strategy for addressing such publications in the future.

216.    The video and the lack of a meaningful response from the administration were detrimental to many people at UConn, including the Plaintiffs, who witnessed the university condone, by its inaction, the trivialization of the trauma they experienced as survivors of sexual assault.

**B.    The University Retaliates Against the Plaintiffs for Opposing Sex Discrimination.**

      **1.    The Plaintiffs File a Formal Complaint, and the University Responds by Demeaning Them.**

217.    On or about October 21, 2013, a number of current and former UConn students, including Plaintiffs Luby, Angell, Daniels and Ricci, filed a Title IX complaint with the U.S. Department of Education's Office for Civil Rights ("OCR") alleging that UConn was deliberately indifferent to a number of reports of rape and sexual assault.

218.    Two days later, on or about October 23, 2013, UConn President Susan Herbst issued a statement to the university's Board of Trustees, responding to the Plaintiffs' complaint.

The statement stated, in pertinent part, that: "The suggestion that the University of Connecticut as an institution could somehow be indifferent to or dismissive of ANY report of sexual assault is astonishingly misguided and demonstrably untrue."  It further stated: "I cannot speak to the motivations of people who have suggested this."

219.    These statements furthered the hostile educational environment to which the Plaintiffs have been subjected in the aftermath of their initially internal and then public complaints about the sexual assaults to which they had been subjected and the indifferent manner with which UConn treated them once it was on notice of their assaults.  Ms. Herbst's statements, which denigrated the Plaintiffs' allegations as "astonishingly misguided," strongly suggested that their motivation for bringing such allegations was an improper one.

### 2.    Carolyn Luby

220.    President Herbst's statement questioning Carolyn Luby's motivations caused the student body to do the same.  Numerous students repeatedly challenged Ms. Luby regarding her actions.  They asked her, "Why are you doing this?"  Others accused her of "crying wolf."  One student expressed to Ms. Luby that she was "crying wolf" because "that's what the President thinks."

221.    Ms. Luby had led the organization and drafting of the OCR complaint, devoting hundreds of hours of her time.  To have her work discredited and demeaned, both by the university and by her fellow students, was extremely distressing to Ms. Luby.

222.    The statements compounded Ms. Luby's alienation from the university community and made her fearful of returning to campus.  She experienced extreme anxiety at the thought of being on a campus where she received death and rape threats and where the President

had questioned her motives, reasonableness, and truthfulness. In addition to her emotional distress, Ms. Luby's class attendance also suffered, and she was forced to drop a course in which she was excelling.

### 3. Kylie Angell

223. Kylie Angell graduated from UConn in 2013, yet President Herbst's statements still had a significant impact on her.

224. Ms. Angell has foregone opportunities to return to the School of Nursing, such as an alumni board meeting, for fear of being treated with hostility.

225. She had been planning to apply to graduate school at UConn. She felt that UConn was the most affordable and prestigious option available to her. However, she now feels intimidated by the administration and unwelcome at the university, and she will not be applying to UConn.

226. Ms. Angell is concerned that she will be viewed in the future as a liar, based upon President Herbst's statement that her allegations are "demonstrably untrue."

227. Since President Herbst's statements, Ms. Angell has experienced shame, embarrassment, and self-blame — many of the same emotions that resulted from her sexual assault and which she has worked for years to conquer.

### 4. Erica Daniels

228. After President Herbst's statements, Erica Daniels experienced substantial hostility from her fellow students. Some of her own friends even questioned her motives, saying she had filed her complaint "for revenge."

229.    The hostile environment on UConn's campus has negatively impacted Ms. Daniels class attendance.  She does not feel comfortable on campus, and she has experienced continued emotional distress.

**5.    Rosemary Richi**

230.    Rosemary Richi's experience following President Herbst's statements has been similar to the other Plaintiffs.  She has received several anonymous messages questioning her motivations with respect to the OCR complaint.  Other messages blamed her for the substandard investigation conducted by the UConn police.  Some students told Ms. Richi that she was "giving UConn a bad name."

231.    These statements have reinforced Ms. Richi's isolation from the UConn student body.

## X.    LEGAL CLAIMS

**FIRST CLAIM FOR RELIEF:
SEX DISCRIMINATION IN VIOLATION OF TITLE IX
OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,
AGAINST THE UNIVERSITY OF CONNECTICUT,
AS TO CAROLYN LUBY.**

232.    Ms. Luby incorporates by reference each and every allegation in paragraphs 1 through 231, above.

233.    Upon information and belief, UConn receives federal financial assistance.

234.    Ms. Luby sustained harassment because of her sex that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities.

235.    The harassment of Ms. Luby occurred in a context that was subject to UConn's control and where UConn could have taken remedial action.

236.    UConn had actual knowledge of the harassment sustained by Ms. Luby and others.

237.    UConn's response to the harassment sustained by Ms. Luby and/or its lack of response was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

**SECOND CLAIM FOR RELIEF:
SEX DISCRIMINATION IN VIOLATION OF TITLE IX
OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,
AGAINST THE UNIVERSITY OF CONNECTICUT,
AS TO KYLIE ANGELL.**

238.    Ms. Angell incorporates by reference each and every allegation in paragraphs 1 through 231, above.

239.    Upon information and belief, UConn receives federal financial assistance.

240.    Ms. Angell sustained harassment because of her sex that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities.

241.    The harassment of Ms. Angell occurred in a context that was subject to UConn's control and where UConn could have taken remedial action.

242.    UConn had actual knowledge of the harassment sustained by Ms. Angell and others.

243.    UConn's response to the harassment sustained by Ms. Angell and/or its lack of response was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

**THIRD CLAIM FOR RELIEF:**
**SEX DISCRIMINATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST THE UNIVERSITY OF CONNECTICUT,**
**AS TO ERICA DANIELS.**

244.    Ms. Daniels incorporates by reference each and every allegation in paragraphs 1 through 231, above.

245.    Upon information and belief, UConn receives federal financial assistance.

246.    Ms. Daniels sustained harassment because of her sex that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities.

247.    The harassment of Ms. Daniels occurred in a context that was subject to UConn's control and where UConn could have taken remedial action.

248.    UConn had actual knowledge of the harassment sustained by Ms. Daniels and others.

249.    UConn's response to the harassment sustained by Ms. Daniels and/or its lack of response was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

**FOURTH CLAIM FOR RELIEF:**
**SEX DISCRIMINATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST THE UNIVERSITY OF CONNECTICUT,**
**AS TO ROSEMARY RICHI.**

250.    Ms. Richi incorporates by reference each and every allegation in paragraphs 1 through 231, above.

251.    Upon information and belief, UConn receives federal financial assistance.

252.    Ms. Richi sustained harassment because of her sex that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities.

253.    The harassment of Ms. Richi occurred in a context that was subject to UConn's control and where UConn could have taken remedial action.

254.    UConn had actual knowledge of the harassment sustained by Ms. Richi and others.

255.    UConn's response to the harassment sustained by Ms. Richi and/or its lack of response was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

### FIFTH CLAIM FOR RELIEF:
### SEX DISCRIMINATION IN VIOLATION OF TITLE IX
### OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,
### AGAINST THE UNIVERSITY OF CONNECTICUT,
### AS TO SILVANA MOCCIA.

256.    Ms. Moccia incorporates by reference each and every allegation in paragraphs 1 through 209, above.

257.    Upon information and belief, UConn receives federal financial assistance.

258.    Ms. Moccia sustained harassment because of her sex that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities.

259.    The harassment of Ms. Moccia occurred in a context that was subject to UConn's control and where UConn could have taken remedial action.

260.    UConn had actual knowledge of the harassment sustained by Ms. Moccia and others.

261.    UConn's response to the harassment sustained by Ms. Moccia and/or its lack of response was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

**SIXTH CLAIM FOR RELIEF:**
**RETALIATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST THE UNIVERSITY OF CONNECTICUT,**
**AS TO CAROLYN LUBY.**

262.    Ms. Luby incorporates by reference each and every allegation in paragraphs 1 through 231, above.

263.    Ms. Luby engaged in protected activity under Title IX, insofar as she filed a complaint of sex discrimination with the U.S. Department of Education's Office for Civil Rights.

264.    UConn committed an adverse action against Ms. Luby because of her protected activity, insofar as it publicly questioned her motives, reasonableness, and truthfulness and encouraged its students to do the same.

265.    As a result of UConn's adverse action, Ms. Luby has suffered damages.

266.    The adverse action taken by UConn might well have dissuaded a reasonable person in Ms. Luby's position from making a charge of discrimination.

**SEVENTH CLAIM FOR RELIEF:**
**RETALIATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST THE UNIVERSITY OF CONNECTICUT,**
**AS TO KYLIE ANGELL.**

267.    Ms. Angell incorporates by reference each and every allegation in paragraphs 1 through 231, above.

268.    Ms. Angell engaged in protected activity under Title IX, insofar as she filed a complaint of sex discrimination with the U.S. Department of Education's Office for Civil Rights.

269.    UConn committed an adverse action against Ms. Angell because of her protected activity, insofar as it publicly questioned her motives, reasonableness, and truthfulness and encouraged its students to do the same.

270.    As a result of UConn's adverse action, Ms. Angell has suffered damages.

271.    The adverse action taken by UConn might well have dissuaded a reasonable person in Ms. Angell's position from making a charge of discrimination.

**EIGHTH CLAIM FOR RELIEF:**
**RETALIATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST THE UNIVERSITY OF CONNECTICUT,**
**AS TO ERICA DANIELS.**

272.    Ms. Daniels incorporates by reference each and every allegation in paragraphs 1 through 231, above.

273.    Ms. Daniels engaged in protected activity under Title IX, insofar as she filed a complaint of sex discrimination with the U.S. Department of Education's Office for Civil Rights.

274.    UConn committed an adverse action against Ms. Daniels because of her protected activity, insofar as it publicly questioned her motives, reasonableness, and truthfulness and encouraged its students to do the same.

275.    As a result of UConn's adverse action, Ms. Daniels has suffered damages.

276.    The adverse action taken by UConn might well have dissuaded a reasonable person in Ms. Daniels' position from making a charge of discrimination.

**NINTH CLAIM FOR RELIEF:**
**RETALIATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST THE UNIVERSITY OF CONNECTICUT,**
**AS TO ROSEMARY RICHI.**

277.    Ms. Richi incorporates by reference each and every allegation in paragraphs 1 through 231, above.

278.    Ms. Richi engaged in protected activity under Title IX, insofar as she filed a complaint of sex discrimination with the U.S. Department of Education's Office for Civil Rights.

279.    UConn committed an adverse action against Ms. Richi because of her protected activity, insofar as it publicly questioned her motives, reasonableness, and truthfulness and encouraged its students to do the same.

280.    As a result of UConn's adverse action, Ms. Richi has suffered damages.

281.    The adverse action taken by UConn might well have dissuaded a reasonable person in Ms. Richi's position from making a charge of discrimination.

**TENTH CLAIM FOR RELIEF:**
**RETALIATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST THE UNIVERSITY OF CONNECTICUT,**
**AS TO SILVANA MOCCIA.**

282.    Ms. Moccia incorporates by reference each and every allegation in paragraphs 1 through 209, above.

283.    Ms. Moccia engaged in protected activity under Title IX, insofar as she reported her rape to various UConn employees, including the Associate Director of UConn's Women's Center, her team doctor, her hockey coach, and UConn's Director of Community Standards.

284.     UConn committed an adverse action against Ms. Moccia in that, following her report of the rape, it removed her from the hockey team and encouraged her to leave the university.

285.     As a result of UConn's adverse actions, Ms. Moccia has suffered damages.

286.     The adverse actions taken by UConn might well have dissuaded a reasonable person in Ms. Moccia's position from making a charge of discrimination.

**WHEREFORE,** the Plaintiffs request that this Court:

a.     Accept jurisdiction over this action;

b.     Empanel a jury to fairly hear and decide this action;

c.     Award to the Plaintiffs an injunction and order requiring that the Defendant revise its policies, procedures, and practices so that it is in compliance with Title IX;

d.     Award to the Plaintiffs compensatory damages resulting from their pain and suffering resulting from the Defendant's deliberate indifference;

e.     Award to the Plaintiffs reasonable attorneys' fees and costs expended in litigating this matter; and

f.     Award to the Plaintiffs such other relief as it deems just and proper.

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFFS**

By: ___/s/ Nina T. Pirrotti_____ _

      Nina T. Pirrotti  (*ct26792*)
      Joshua R. Goodbaum  (*ct28834*)
      GARRISON, LEVIN-EPSTEIN, RICHARDSON,
          FITZGERALD & PIRROTTI, P.C.
      405 Orange Street
      New Haven, CT  06511
      Tel.:  (203) 777-4425
      Fax:  (203) 776-3965
      E-mail:  npirrotti@garrisonlaw.com

           and

      Gloria Allred  (*admitted pro hac vice*)
      Nathan Goldberg  (*admitted pro hac vice*)
      ALLRED, MAROKO & GOLDBERG
      6300 Wilshire Boulevard, Suite 1500
      Los Angeles, CA  90048
      Tel.:  (323) 302-4774
      Fax:  (323) 653-1660
      E-mail:  gallred@amglaw.com
           ngoldberg@amglaw.com

      COUNSEL FOR THE PLAINTIFFS

**<u>CERTIFICATION</u>**

I HEREBY CERTIFY that on this  20th  day of December, 2013, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court's system.


*/s/ Nina T. Pirrotti*
Nina T. Pirrotti  *(ct26792)*